SKAPIK LAW GROUP
Mark J. Skapik (SBN 164957)
Geralyn L. Skapik (SBN 145055)
Blair J. Berkley (SBN 222293)
Eric C. Morris (SBN 243425)
Matthew T. Falkenstein (SBN 333302)
5861 Pine Avenue, Suite A-1
Chino Hills, California 91709
Telephone: (909) 398-4404
Facsimile: (909) 398-1883

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA FIGUEROA, an individual and guardian ad litem to ERIK LOZA, <br><br> Plaintiff, <br><br> vs. <br><br> COUNTY OF SAN BERNARDINO dba ARROWHEAD REGIONAL MEDICAL CENTER; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR**: <br><br> 1. Americans with Disabilities Act, (42 U.S.C. §12181 et seq.), and <br> 2. Dependent Adult Abuse (Welf. & Inst. Code § 15600 et seq.) <br><br><br> JURY DEMAND |

///

///

///

///

///

- 1 -
COMPLAINT

Plaintiff SANDRA FIGUEROA ("Plaintiff") alleges as follows:

1.     Plaintiffs SANDRA FIGUEROA and ERIK LOZA are and were at all times relevant hereto, patients of the State of California, County of San Bernardino. ERIK LOZA brings this action by and through his guardian ad litem SANDRA FIGUEROA. Plaintiff is the mother of ERIK LOZA and brings this Complaint in the capacity of guardian ad litem pursuant to Code of Civil Procedure section 373(c) and *Welfare & Institutions Code* section 15657.3 because ERIK LOZA is in a permanent vegetative state. Plaintiff executed and filed the declaration required by *Code of Civil Procedure* section 373.

2.     Defendant COUNTY OF SAN BERNARDINO dba ARROWHEAD REGIONAL MEDICAL CENTER and DOES 1 through 10  (hereinafter referred to as "ARMC") is, and at all times relevant was in the business of providing care as a general acute care hospital under the fictitious name Arrowhead Regional Medical Center located at 400 Pepper Avenue, Colton, California, and was subject to the requirements of federal and state law regarding the operation of general acute care hospitals in the State of California.

3.     Defendant DOE PHYSICIAN, is an individual, physician, and surgeon licensed and practicing in California at 400 Pepper Avenue, Colton, California.  Plaintiff is informed and believes and thereon alleges that DOE PHYSICIAN is a resident of the County of San Bernardino.

4.     Defendant DOE DIRECTOR was the medical director of ARMC over the period August 15, 2021, to September 29, 2021, an employee or agent of ARMC, and a physician licensed by the State of California.  Plaintiff is informed and believes and thereon alleges that DOE DIRECTOR is a resident of the County of San Bernardino.

5.     Defendant DOE RN was the Director (or Acting Director) of Nursing at ARMC over the period August 15, 2021, to September 29, 2021, an employee or agent of ARMC, and a registered nurse licensed by the State of California.  Plaintiff is informed

and believes and thereon alleges that DOE RN is a resident of the County of San Bernardino.

6. The true names and capacities, whether individual, corporate, or otherwise, of Defendants DOE 1 through 10, inclusive, DOE DIRECTOR, DOE PHYSICIAN and DOE RN are unknown to Plaintiff at this time who, therefore, sues these Defendants by such fictitious names. When the true names and capacities of these Defendants are ascertained, Plaintiff will amend this Complaint to allege their true names and capacities.

7. Upon information and belief, Plaintiff alleges that Defendants DOE PHYSICIAN, DOE DIRECTOR, DOE RN and DOES 1 through 10, inclusive, were the owners, operators, managing agents, employees, servants, and supervising agents, of defendant COUNTY OF SAN BERNARDINO dba ARROWHEAD REGIONAL MEDICAL CENTER, and were at all times acting within the course and scope of their ownership, management, employment, servitude, or agency, respectively, and acted with defendant's knowledge and consent, at defendant's direction, and for defendant's financial benefit, making said hospital-defendant liable for the wrongful acts and omissions of said DOE PHYSICIAN, DOE DIRECTOR, DOE RN and DOES 1 through 10, as alleged hereafter, under the doctrine of Respondeat Superior, and/or, Principal-Agent.

8. In doing the things hereinafter alleged, Defendants, and each of them, acted as the agents, servants and employees of their co-defendants and acted both within the course and scope of said agency and employment and with the knowledge, consent, and approval of their co-defendants. In addition, all of said acts were ratified by the co-defendants and the managing agents of each of the defendants by their failure to properly investigate, report or discipline any staff members for the incident which is the subject of this lawsuit and through a consistent failure to intercede in the known pattern of dependent adult abuse.

9. In addition, as a result of the failure of Defendants, and each of them, to comply with mandatory federal and state laws and regulations designed for the protection of dependent adults which, when coupled with the fact that said Defendants continue to

hold themselves out to the public as providing adequate care, constitutes an unfair and deceptive business practice, Plaintiff is entitled to recover treble damages pursuant to Civil Code § 3345(b). As a result of the above-described malicious, oppressive, intentional, and reckless conduct of Defendants and DOES 1 through 10, and each of them, Plaintiff is entitled to recover damages for the above-described personal and emotional injuries, suffering and damages incurred by Plaintiff, as well statutory payments and attorneys' fees and costs pursuant to the provisions of Welfare & Institutions Code §§ 15657-15657.3.

10.     Plaintiff, based upon information and belief, alleges that Defendants and DOES 1 through 10, inclusive, were advertised by their managing agents as facilities, which provided adequate care and services to dependent and elder adults. Moreover, the managing agents of said facilities, by and through their campaign of advertisement, marketing devices, schemes and promises, targeted would be patients, many of whom they knew or reasonably should have known were in extremely poor health and condition and in desperate and continuing need of adequate and reasonable care and services.

11.     Plaintiff, based upon information and belief, further alleges that as a result of such conduct, the managing agents of the subject hospital were successful in filling their respective hospital with patients who, for the most part, were in need of ongoing care and dependent upon said defendants for care, services, and assistance with the most basic activities of daily living and for their health and safety.

12.     Plaintiff, based upon information and belief, alleges that decedent suffered the below-described injuries because the subject hospital was understaffed and because persons employed by the subject hospital were wholly untrained, incompetent, overworked, and overwhelmed by their respective daily patient work assignments. Moreover, the staff members of the subject hospital were completely unqualified to provide care to dependent persons such as ERIK LOZA. The managing agents of the subject hospital, including Administrators and Directors of Nursing, had advance notice

of the unfitness of the persons taking care of ERIK LOZA, yet they continued to utilize and employ such persons.

13. At all times material hereto, the managing agents and employees of the subject hospital actively hid the information of dependent adult abuse and neglect, and actively engaged in tactics of deceiving Plaintiff of his deteriorating condition.

14. The acts and conduct of Defendants, and each of them, as described below, were malicious, oppressive, and fraudulent, and were despicable acts and conduct that were done in conscious disregard of ERIK LOZA rights and safety, subjecting him to cruel and unjust hardship, abuse, neglect, great bodily injury, severe physical and emotional pain and suffering.

15. Plaintiff is informed and believes, and thereupon alleges, that each of the defendants fictitiously named herein as a DOE is legally responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and thereby proximately caused the injuries and damages to ERIK LOZA as hereinafter alleged. The Plaintiff will ask leave of the Court to amend this complaint to insert the true names and/or capacities of such fictitiously named defendants when the same have been ascertained.

## JURISDICTION AND VENUE

16. The Courts of the United States have original jurisdiction over this action by virtue of 28 U.S.C. Section 1331 and 1343(a)(3)-(4) because Plaintiffs assert claims arising under the laws of the United States for violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq.

17. Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this district and all incidents, events, and occurrences giving rise to this action occurred in this district.

18. On May 3, 2021 Plaintiff personally served a tort claim for damages upon the COUNTY OF SAN BERNARDINO DBA ARROWHEAD REGIONAL MEDICAL CENTER. Government Code § 911.4. On or about November 3, 2021, said claim was

deemed denied by operation of law. Plaintiff requests a determination from the court that that his claim complied with California Tort Claims Act (CTCA) on the grounds that the claims originally presented to defendants complied with the statutory requirements, or in the alternative, that the application for leave to present late claims meets statutory requirements under CTCA, and leave should be granted, based upon ERIK's mental vegetative state diagnosed on September 15, 2021, and persisting to present.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

19.     ERIK LOZA ("ERIK") was born on August 3, 2000.  At all times relevant, ERIK was a resident of the County of San Bernardino.

20.     Under the provisions of Welfare & Institutions Code § 15610.27, at all times material hereto, ERIK was a dependent adult due to his severe physical limitations.

21.     ERIK visited ARMC Emergency Department on August 15, 2021 immediately after a seizure. ERIK was admitted to ARMC on August 15, 2021, at 9:52 a.m. with a diagnosis of a large left frontoparietal intracerebral brain hemorrhage.  Upon admission, ARMC notated that ERIK's skin integrity was intact.

22.     At admission, ARMC was informed that ERIK had a history of seizures, pre-existing deafness and mental disabilities. At admission to ARMC, ERIK was a patient known to be fully dependent for his daily custodial care needs, including supervision, observation and assistance with eating, mobility, transfers, medications, toileting and wound care as required for his safety and to avoid injury. During admission, ERIK was noted to be free from any infection as evidenced by examination, vital signs and laboratory values.

23.     Defendant's administrators, nursing staff and health care providers knew from the admitting orders and pre-placement assessments that ERIK was a totally dependent adult requiring assistance for his daily care needs, including wound care and toileting assistance that if not provided would result in severe injury to Plaintiff.

24.     On September 1, 2021, ERIK underwent surgery for a decompressive craniectomy followed by a cranioplasty. On September 8, 2021, ERIK underwent a second surgery for an aneurysm clipping.

25.     While at ARMC from August 15, 2021 through September 29, 2021, ERIK had no bed mobility, had no safety awareness, was non verbal, and considered a "total assist."

26.     While at ARMC from August 15, 2021 through September 29, 2021, SANDRA was present at ARMC at ERIK's bedside. Multiple times, SANDRA requested of Defendants to provide wound care, changing the soiled bed, provide nourishment, and in response to SANDRA, Defendants refused to properly provide care. SANDRA communicated to the Nurse Supervisor and Doctors and DOES 1 through 10 regarding said refusal to provide proper care to ERIK and they ignored SANDRA and refused to remediate.

27.     As a result of the gross and reckless lapses in the custodial care needs of ERIK for his safety, ERIK's attending physicians along with the supervising nursing staff at ARMC, fail to assess, manage, and treat his worsening wounds. Due to these willful failures in custodial care, Plaintiff is allowed to deteriorate in overall status over a period of days while his care needs are neglected and ignored.

28.     As a further result of Defendants' willful and reckless disregard for Plaintiff's wound care and custodial care needs, ERIK suffered avoidable injuries and surgeries with resulting ongoing pain and daily functional limitations which are continuing through the present, that resulted from Defendants deprivation of custodial care services needed for the safety and well-being of ERIK in violation of his patient and statutory rights.

29.     Throughout Plaintiff's admission to ARMC, he was periodically assessed by his attending physicians. The physician progress notes utterly fail to accurately document ERIK's worsening wound status evident from the increased drainage, pain and other indicators of infection. Defendant physicians fail to document critical changes to the

wounds, including failing to note the type, amount, and consistency of drainage or the appearance of the wounds or changes in ERIK's bladder/bowel function or his declining nutritional status that is needed for wound healing.

30.    Because ERIK was a patient at the subject hospital, under the care of the subject physicians, at all times material hereto, Defendants, and each of them, had a duty under federal and state regulations which were designed for protection and benefit of patients like ERIK as well as under common law, to provide him with reasonable and adequate care, comfort and safety. Specifically, Defendants, and each of them, owed ERIK the duty to:

a. Establish and implement a patient care plan for ERIK based upon and including, without limitation, an ongoing process of identifying his care needs;

b. Provide bed mobility assistance, including repositioning care to avoid the development and progression of bed pressure sores, skin irregularities and infection;

c. Timely monitor the wounds to ensure prompt medical attention and care to prevent the development of infection;

d. Follow, implement, and adhere to all physician orders;

e. Note and properly react to emergent conditions;

f. Attend to and maintain ERIK'S physical and personal hygiene;

g. Monitor and record ERIK'S condition and report meaningful changes to his attending physicians and family;

h. Maintain nursing and other staffing levels adequate to meet the needs of patients of their facilities, including ERIK;

i. Provide ERIK with adequate nutrition and hydration;

31.    ERIK's sustained a sacrococcyx pressure ulcer (black, drainage, unhealthy, irregular, 6cm x 6cm), right ear pressure ulcer, and a 3cm wound on his penis head.

32.     While a patient at ARMC, Defendants, and each of them, continued to breach their aforesaid duties to ERIK. These breaches were willful, intentional, and reckless, and were performed in conscious disregard of the probability that severe injury would result, including the development and progression of an infection due to the failure of Defendants to carefully adhere to their duties.

33.     On September 29, 2021, ERIK was discharged from ARMC to Community Extended Care Hospital ("CECH") located at 9620 Fremont Ave, Montclair, California.

34.     On September 30, 2021, ERIK was given a pre-admission evaluation at CECH.  CECH's Diagnosis Report includes the following diagnoses: sacrococcyx pressure ulcer (black, drainage, unhealthy, irregular, 6cm x 6cm), right ear pressure ulcer, wound on penis head, respiratory failure, tracheostomy, ventilator, cerebral aneurysm, intracerebral hemorrhage viral syndrome, strabismus, cerebral seizures, altered mental state, pressure ulcers, malnourished, fixed pupil of left eye, decerebration posture, midline shift of brain, spontaneous intraparenchymal, intracranial hemorrhage acute, urinary tract infection, hypertension, gastric ulcer, bacteremia, dysphagia, mydriasis, and vegetative status. ERIK additionally had chest area rashes, multiple discoloration of his left arm, upper to mid back purple-red-maroon rashes, groin rashes and anus rashes.

35.     After leaving ARMC, ERIK underwent multiple surgeries including surgeries for muscle tissue debridement of the sacrococcyx pressure ulcer on the following dates, October 11, 2021, October 18, 2021, November 1, 2021, November 8, 2021 and November 15, 2021,

36.     An assessment performed on September 30, 2021, gave ERIK a Braden Scale score of 8/23 for predicting pressure-sore risk, stating that ERIK is and was at a severe risk for developing, delay and worsening of his pressure ulcers due to comorbidities.  It was noted that his skin on his heels were discolored, but had no open areas.

37.     ERIK was unable to ambulate as a consequence of his mental impairment, general weakness and pain.

38.    On or about October 1, 2021, Dr. Ali Salem stated ERIK LOZA "does not have the capacity to make decisions....total assist non verbal, vegetative status...tube feeding." As of November 2022, ERIK LOZA's mental condition has not improved.

39.    The application of the Elder/Dependent Abuse Act against acute care facilities and hospitals such as ARMC fits squarely under the existing case law, statutory language, and jury instructions. Indeed, the Elder/Dependent Abuse Act (Act) itself includes a broad list of facilities to which the Act applies, making no distinction between skilled nursing facilities and acute care facilities. Welfare and Institutions Code Section 15610.17 states in part: "'Care custodian' means an administrator or an employee of any of the following public or private facilities or agencies, or persons providing care or services for elders or dependent adults, including members of the support staff and maintenance staff: (a) Twenty-four-hour health facilities, as defined in Sections 1250, 1250.2, and 1250.3 of the Health and Safety Code."

40.    Health and Safety Code Section 1250 includes "general acute care hospital," as well as "skilled nursing hospital," providing a solid basis for the argument that the Elder/Dependent Abuse Act applies equally to the acute care setting. Similarly, the CACI Jury Instructions on Elder/Dependent Abuse make no distinction between elder abuse in a skilled nursing hospital and elder abuse in the acute care setting. CACI 3103, 3105 and 3113. The decision in *Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, further supports this conclusion. In *Marron*, the plaintiff sued defendant UCSD Medical Center for custodial neglect for failure to diagnose an infection while plaintiff was a patient in defendant's hospital, in part due to chronic understaffing of the hospital. The court held that evidence of the hospital's neglect in failing to diagnose and treat the infection was sufficient to constitute custodial abuse under Welfare and Institutions Code §15610 et seq. (Id. at 1068.). Custodial neglect can and does occur in the acute care setting. Notably, the court in *Marron* found that a nursing supervisor in a hospital is a managing agent in an elder abuse case.

41.     At all relevant times herein, ERIK was a qualified person with disabilities within the meaning of the ADA and the Unruh Civil Rights Act. ERIK was a disabled person pursuant to Cal. Civ. Code § 1761(g).  At all relevant times herein, ERIK needed assistance with the following activities of daily living: walking, housekeeping, laundry, dressing, bathing, managing medications, toileting, and transportation.

I.

FIRST CAUSE OF ACTION

UNLAWFUL DISCRIMINATION BY PUBLIC ACCOMMODATIONS

(Americans with Disabilities Act, Title III, 42 U.S.C. §12181 et seq.)

(By Plaintiff Against ARMC and DOES 1 through 10)

42.     Plaintiffs re-allege and incorporate each of the preceding paragraphs herein as though set forth in full.

43.     At all times relevant to this action, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., was in full force and effect in the United States:  Title III - "Public Accommodations and Services Operated by Private Entities" - of the Americans with Disabilities Act of 1990, 42 U.S.C. §12182, states:  "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, p1ivileges, advantages, or accommodations of an place of public accommodation by any person who owns, leases (or leases to), or operated place of public accommodation." (42 U.S.C. §12182(a).)

44.     Among the public accommodations identified for purposes of Title III are: "(7) Public accommodation. The following private entities are considered public accommodations for purposes of this title, if the operations of such entities affect commerce *** professional office of a health care provider, hospital, or other service establishment." (42 U.S.C. §12181(7)(f).)

45.     The specific prohibitions against discrimination set forth in 42 U.S.C. § 12182(b)(2)(a) are: "(i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with

1  disabilities from fully and equally enjoying any goods, services, facilities, privileges,

2  advantages, or accommodations… (a) a failure to make reasonable modifications in

3  polices, practices, or procedures, when such modifications are necessary to afford such

4  goods, services, facilities, privileges, advantages, or accommodation to individuals with

5  disabilities…; (b) a failure to take such steps as may be necessary to ensure that no

6  individual with a disability is excluded, denied services, segregated or otherwise treated

7  differently than other individuals because of the absence of auxiliary aids and

8  services,…"  (42 U.S.C. § 12182(b)(2)(a)).

9      46.    Defendants each "own, leases, or operate" a hospital and office(s) of a health

10  care provider and/or provides medical services which qualifies each Defendant as a

11  "place of public accommodation" within the meaning of the ADA.

12      47.    ERIK is a "qualified person with a disability" as defined under the

13  Americans with Disabilities Act and protected by the ADA, because he was deaf, non-

14  verbal and mentally disabled.

15      48.    On or about August 15, 2021 through September 30, 2021, Defendants

16  ARMC and Does 1 through 10 discriminated against ERIK by refusing to provide him

17  the proper medical care as a patient because he was deaf, non-verbal and mentally

18  disabled.

19      49.    While at ARMC from August 15, 2021 through September 29, 2021,

20  SANDRA was present at ARMC at ERIK's bedside. Multiple times, SANDRA requested

21  of Defendants to provide wound care, changing the soiled bed, provide nourishment, and

22  in response to SANDRA Defendants refused to properly provide care. SANDRA

23  communicated to the Nurse Supervisor and Doctors and DOES 1 through 10 regarding

24  said refusal to provide proper care to ERIK and they ignored SANDRA and refused to

25  remediate.

26      50.    Between August 15, 2021 through September 30, 2021, defendants

27  continued to discriminate against ERIK on at least forty-five (45) separate occasions by

28

refusing to communicate with ERIK or his SANDRA in regards to Plaintiffs' requests for proper medical care, because ERIK was deaf, non-verbal and mentally disabled.

51.   Because of defendants' refusals to provide care due to ERIK's disability ERIK was denied full and equal access to the  medical services and/or facilities.

52.   Defendants' failure to provide medical care due to ERIK's disabilities resulted in increased physical pain, medical complications, emotional anguish, embarrassment and humiliation.

## II.

### SECOND CAUSE OF ACTION
### **DEPENDENT ADULT ABUSE (NEGLECT)**
**[Welf. & Inst. Code § 15600 et seq.]**

(By Plaintiff Against ARMC and DOES 1 through 10)

53.   Plaintiffs re-allege and incorporate each of the preceding paragraphs herein as though set forth in full.

54.   At all relevant times, ERIK was between the ages of 18 and 64 years who resides in this state and who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, physical or developmental disabilities, and who was admitted as an inpatient to a 24-hour health hospital, 1250.3 of the Health and Safety Code, and thus, was a "dependent adult" as that term is defined in the Welfare and Institutions Code § 15610.23 and  15657.3.

55.   At all times between August 15, 2021 and September 30, 2021, ERIK was bedfast.

56.   At all relevant times, Defendants operated a hospital under the name of "ARROWHEAD REGIONAL MEDIAL CENTER," as that term is defined in *Health & Safety Code* section 1250.

57.    Defendants' administrators and employees are, pursuant to *Welfare & Institutions Code* section 15610.17(a), defined as *care custodians* under the Dependent Adult Civil Protection Act.

58.    That Defendants were to provide "care or services" to dependent adults, including ERIK and were to be "care custodians" of ERIK and in a trust and fiduciary relationship with ERIK.

59.    That the Defendants "neglected" ERIK as that term is defined in Welfare and Institutions Code § 15610.57 in that the Defendants themselves, as well as their employees, failed to exercise the degree of care that reasonable persons in a like position would exercise by denying or withholding goods or services or care necessary to meet the basic needs of ERIK as is more fully alleged herein.

60.    As a result of the Defendants' wrongdoing, ERIK suffered physical harm, pain or mental suffering.

61.    The Defendants had advance knowledge of the unfitness of their employees and employed him or her with a conscious disregard of the rights or safety of others, "authorized or ratified the wrongful conduct," and the Defendants conduct was "on the part of an officer, director, or managing agent of the corporation." (Civ. Code, § 3294, subd. (b).)

62.    In admitting ERIK to ARMC, Defendants agreed to abide by *Health & Safety Code* sections 1276.65 and 1599.1 and *California Code of Regulations*, Title 22, sections 72311 and 72315.

63.    Defendants were the joint employers of all the nurses and caregivers at ARMC in that:

a.    Defendants ARMC had the power to fire the nurses and caregivers at ARMC.

b.    Defendants ARMC supervised and controlled the nurses and caregivers at ARMC.

c.   Defendants ARMC supervised and controlled nurse and caregiver schedules and employment conditions at ARMC.

d.   Defendants ARMC determined the rate and method of employee compensation at ARMC.

e.   Defendants ARMC maintained employment records for the nurses and caregivers at ARMC.

f.   ARMC managed and controlled ARMC.

64.   *Health & Safety Code* section 1276.65 states: "For the purpose of this section, the following definitions shall apply:"

a.   "'Direct care service hours' means the actual hours of work performed per patient day by a direct caregiver, as defined in paragraph (2)." *Health & Safety Code* § 1276.65(a)(1).

b.   "'Direct caregiver' means a registered nurse . . . , a licensed vocational nurse . . . , a psychiatric technician . . . , and a certified nurse assistant . . . ." *Id.* at 1276.65(a)(2).

65.   *Health & Safety Code* section 1599.1 states that patients have rights including the following:

a.   Facility "…shall employ an adequate number of qualified personnel to carry out all of the functions…" *Health & Safety Code* §1599.1(a).

b.   "Each patient shall show evidence of good personal hygiene and be given care to prevent bedsores, and measures shall be used to prevent and reduce incontinence for each patient." *Health & Safety Code* §1599.1(b).

66.   Title 22, *California Code of Regulations* section 72311(a) states: "Nursing service shall include, but not be limited to, the following:"

a.   "Planning of patient care, which shall include at least the following:" Title 22, *California Code of Regulations* §72311(a)(1).

b.   "Identification of care needs based upon an initial and continuing assessment of the patient's needs with input, as necessary, from health professionals

involved in the care of the patient. Initial assessments shall commence at the time of admission of the patient and be completed within seven days after admission." *Id.* at §72311(a)(1)(A).

        c.     "Development of an individual, written care plan which indicates the care to be given, the objectives to be accomplished and the professional discipline responsible for each element of care. Objectives shall be measurable and time-limited." *Id.* at §72311(a)(1)(B).

        d.     "Reviewing, evaluating and updating of the patient care plan as necessary by the nursing staff and other professional personnel involved in the care of the patient at least quarterly, and more often if there is a change in the patient's condition." *Id.* at §72311(a)(1)(C).

        e.     "Implementing of each patient's care plan according to methods indicated. Each patient's care shall be based on this plan." *Id.* at §72311(a)(2).

    67.    Title 22, *California Code of Regulations* section 72315(f) states, "Each patient shall be given care to prevent formation and progression of decubiti, contractures and deformities. Such care shall include:"

        a.     "Changing position of bedfast and chairfast patients with preventative skin care in accordance with the needs of the patient." Title 22, *California Code of Regulations*, §72315(f)(1).

        b.     "Using pressure-reducing devices where indicated." *Id.* at §72315(f)(4).

        c.     "Providing care to maintain clean, dry skin free from feces and urine." *Id.* at §72315(f)(5).

        d.     "Carrying out of physician's orders for treatment of decubitus ulcers [bedsores]....shall notify the physician, when a decubitus ulcer first occurs, as well as when treatment is not effective, and shall document such notification as required in Section 72311(b)." *Id.* at §72315(f)(7).

***Defendants' officers, directors, and managing agents***

68.     As the owners and operators of ARMC, Defendants owed ERIK a legal duty of care.

69.     Defendants' officers, directors, and managing agents were aware that *Health & Safety Code* section 1276.65 required them to have a minimum number of direct care services hours of 3.5 per patient day.

70.     Defendants' officers, directors, and managing agents were aware that *Health & Safety Code* section 1599.1(a) required them to "employ an adequate number of qualified personnel to carry out all of the functions…."

71.     Defendants' officers, directors, and managing agents were aware that *Health & Safety Code* section 1599.1(b) required them to employ an adequate number of qualified personnel so that each ARMC patient can "be given care to prevent bedsores…"

72.     Nevertheless, with deliberate indifference to ERIK's health and safety and the requirements of *Health & Safety Code* sections 1276.65 and 1599.1(a) and (b), the pattern and practice of Defendants' officers, directors, and managing agents was to continuously (at all times between August 15, 2021 and September 29, 2021) and systematically understaff ARMC so as to reduce operating costs with knowledge of the high degree of probability that ERIK would suffer injuries.

73.     The acts and omissions of Defendants' officers, directors, and managing agents were all within the scope of their employment at ARMC.

74.     As a proximate result of Defendants' understaffing of ARMC, Defendants' nurses and caregivers were unable to provide ERIK the care he required by *Health & Safety Code* section 1599.1(b) to prevent the development and progression of decubitus ulcers (pressure sores or bedsores).

75.     As a proximate result of Defendants' understaffing of ARMC, ERIK was injured.

*Defendants' nurses and caregivers*

76.     As care custodians at ARMC, the nurses and caregivers owed ERIK a legal duty of care.

77.     Defendants' nurses and caregivers at ARMC were aware of the requirements of Title 22, *California Code of Regulations* section 72311(a) regarding the development and maintenance of care plans for each ARMC resident.

78.     Nevertheless, with deliberate indifference to ERIK's health and safety and the requirements of section 72311(a), and with knowledge of the high degree of probability that ERIK would suffer injuries, Defendants' nurses and caregivers' pattern and practice was to:

        a.      not implement ERIK's care plan,

        b.      not provide ERIK the care specified in his plan,

        c.      not document the care provided to ERIK pursuant to his plan,

        d.      not check ERIK's skin condition on a daily basis,

        e.      not document ERIK's skin condition on a daily basis,

        f.      not continually re-assess ERIK's needs,

        g.      not notify ERIK's attending physician when there was a need to revise ERIK's care plan, and

        h.      not revise the care plan when ERIK's needs required a plan change.

79.     Defendants' officers, directors, and managing agents authorized and ratified the care provided to ERIK in violation of his care plan and Title 22, *California Code of Regulations* section 72311(a).

80.     Defendants' nurses and caregivers at ARMC were aware of the requirements of Title 22, *California Code of Regulations* section 72315(f) regarding the care requirements to prevent formation and progression of decubiti.

81.     Nevertheless, with deliberate indifference to ERIK's health and safety and the requirements of section 72315(f), and with knowledge of the high degree of

probability that ERIK would suffer injuries, Defendants' nurses and caregivers' pattern and practice was to:

        a.    not check ERIK's skin condition on a daily basis,

        b.    not document ERIK's skin condition on a daily basis,

        c.    not change the position of ERIK with preventative skin care in accordance with his needs and care plan,

        d.    not use pressure-reducing devices where indicated,

        e.    not provide care to maintain clean, dry skin free from feces and urine, and

        f.    not notify ERIK's attending physician when there was a need to revise ERIK's skin care plan.

82.    Defendants' officers, directors, and managing agents authorized and ratified the care provided to ERIK in violation of his care plan and Title 22, *California Code of Regulations* section 72315(f).

83.    The acts and omissions of Defendants' nurses and caregivers were all within the scope of their employment at ARMC.

84.    As a proximate result of the nurses and caregivers' failure to comply with Title 22, *California Code of Regulations*, sections 72311(a) and 72315(f), ERIK was injured.

85.    Defendant ARMC has been previously cited by both State and Federal authorities for deficiencies in basic care and wound management.

86.    For example, on February 22, 2022, ARMC was issued a citation by the State of California regarding, "This Statute is not met as evidenced by: Based on interview and record review, the hospital nursing staff failed to ensure medication administration for the treatment of wound and pressure ulcer (PU- an injury to skin and underlying tissue resulting from prolonged  pressure on the skin) followed the physician's prescribed instructions... Patient A's sacralcoccyx progressed to a stage 3 (full-thickness loss of skin, in which fat is visible in the tissue) PU... The CWON confirmed, the

[Collagenase] medication was not administered daily as the physician ordered.... She further stated, the Collagenase was needed for proper sacralcoccyx wound treatment.." (CDPH, ARMC, 2/22/22, No. CA00721446).

87.   On February 22, 2022, ARMC was issued a second citation by the State of California regarding, "This Statute is not met as evidenced by: Based on interview and record review, the hospital failed to ensure they fully implemented their written policies and procedures regarding the prevention of pressure injuries (PI- caused by externally applied pressure on a body part for a period of time that disrupts blood flow and results in tissue damage) for a hospitalized patient (Patient 1), when, the hospital documentation did not indicate the completion of skin inspections of the areas ... Other wound type: ... Stage: Unstageable ... Full Thickness ... Area affected is approximately 10.cm x 2.cm-linear in shape ... The PCPIP further stated, Patient 1's gap in skin inspection documentation beyond July 17, 2019, did not meet her expectations, and again stated the nurses were expected to inspect patients' skin every shift, and these inspections are to be documented to verify completion..... During a review of the hospital's policy and procedure (P&P) titled, "VIII. Specialty Services, Pressure Injuries (PI): Identification, Prevention and Management," dated May 2019, the P&P indicated, "Policy: I. [Name of Hospital/Initials of Hospital Name] is committed to the following goals: A. Prevention of hospital acquired pressure injuries (PI) ... IV. [Initials of Hospital Name] nurses follow these guidelines that support evidence based practice for the following: ... B. Initiation of a plan of care for prevention of PI for those patients at risk. C. Prevention interventions for those at risk ... Procedure: ... B. Skin and Wound Assessment. 1. Patient are assessed head to toe for alteration in skin integrity on admission, every shift ... 3. Boney prominences of patients found to be at risk, (less than 18 Braden score) are checked every shift ... II. Prevention Interventions: ... B. Mobility/Turning/Positioning and Skin Care for At Risk for Impaired Skin Integrity ... 6. The occipital region of the scalp is the primary site for PI formation in infants, toddlers, some adults ... IV. Documentation: A. Fully document observations relating to skin ... Include measures employed to prevent

and treat these issues ... D. Review the plan of care daily and revise as indicated ... VI. PI Monitoring:  ... F. PI prevention is a nurse sensitive goal and is a priority throughout the organization ...""    (CDPH, ARMC, 2/22/22, No. CA00650308).

88.   On August 19, 2021, ARMC was issued a citation by the State of California regarding, "(a) A registered nurse shall directly provide: (1) Ongoing patient assessments as defined in the Business and Professions Code, Section 2725(d). Such assessments shall be performed, and the findings documented in the patient's medical record, for each shift, and upon receipt of the patient when he/she is transferred to another patient care area." (CDPH, ARMC, 8/19/22)

89.   On March 3, 2021, ARMC was issued a citation by the State of California regarding, "Findings: An unannounced visit was conducted to investigate an allegation of withholding life-sustaining medical care... One deficiency was issued for Complaint Number CA00700315." (CDPH, ARMC, 3/3/21, No. CA00700315).

90.   Based on ERIK's prior medical history and assessments, Defendants, knew that ERIK's health and safety would be put at great risk, especially because he was a dependent person, if he was not provided with necessary supervision as well as needed medical care and services. Defendants also knew that due to ERIK's physical condition, he was unable to provide for his own basic needs and was dependent on them for meeting his basic needs such as nutrition, hydration, as well as medical care and health services, assistance and monitoring with feeding, the provision of safety and assistance devices to prevent accidents, and the implementation of interventions to prevent skin breakdown and infections. Nevertheless, not only was said care and services routinely withheld from ERIK but he was not even provided with the minimum care mandated by federal and/or state laws even though Defendants knew it was substantially certain that ERIK would suffer injury due to the failure to provide the care and services he needed and which was mandated by law. Moreover, the ongoing and repeated nature of Defendants' failure to provide such services and care demonstrates that Defendants acted with conscious

disregard of the high probability that ERIK would suffer injury as a result of their failure to provide the care and services he needed which was mandated by law.

91.    Defendants' neglect of ERIK was reckless, oppressive, and malicious. Specifically, the individuals who cared for ERIK knew that taking the necessary precautions to prevent him from incurring avoidable pressure ulcers was critical to his health, well-being, and prognosis. By failing to address ERIK's patient care issues, Defendants knew that it was highly probable that he would suffer injury.

92.    ERIK'S injuries would not have occurred had the Defendants simply adhered to applicable rules, laws and regulations, as well as the acceptable standards of practice governing the operation of a hospital.

93.    Additionally, in violation of Title 42 C.F.R. 483.10(b)(1)&( 1), Title 22 C.C.R. section 72311(a) and 72527(a)(3), Defendants' failed to report the status of the deteriorating and changing condition of ERIK'S hydration and nutritional status to his attending physician or family. In further violation of Title 42 C.F.R. 483.20(k)(ii), neither ERIK'S attending physician or family was asked to participate in an interdisciplinary team care plan meeting to ensure he was receiving the treatment he needed to stay properly hydrated and nourished. In fact, although ERIK'S mom SANDRA repeatedly voiced concern over ERIK'S deteriorating condition. In response, ARMC staff falsely reported that ERIK was stable and that there was no need for concern.

94.    In violation of Title 42 C.F.R. Section 483.75(j), Defendants' records containing ERIK'S records were not complete or accurate. Additionally, neither the notes of the nurses complied with Title 22 C.C.R. Section 72547(a)(5). Moreover, Defendants' personnel consistently failed to document the true status of ERIK'S decubitus ulcer, his hydration and/or the infection, which progressively worsened under the care of Defendants. As a result, he was denied the needed medical care because other health professionals and service providers detrimentally relied on the fraudulent, inaccurate and/or incomplete records in evaluating and ordering care and services and based on those records did not order necessary care and services that would have been ordered had

the records been true, accurate and complete. Further, Defendants' staff failed to maintain ERIK'S records with the appropriate and correct patient records.

95.     As a direct result of the chronic understaffing at Defendants' facilities in both number and training, Defendants failed to provide ERIK with proper care to prevent skin breakdown, infections, and dehydration, and failed to ensure that ERIK received adequate hydration and nutrition to starve off infections, skin breakdown, and failed to timely react to ERIK's emergent conditions including the development of entirely preventable and treatable infections. ERIK suffered these injuries because the Defendants' staff simply did not have adequate time or the inclination to provide her with the required care and to document and address her emergent conditions. These injures were entirely preventable had there been sufficient staff on duty, in both number and competency, to actually implement the protections required by the Defendants' own Plan of Care and Physician Orders and assessments for ERIK. Unfortunately, there was not sufficient staff on duty at the Defendants' facilities to implement the protections called for in ERIK's Plan of Care and Physician Orders and assessments for ERIK and he suffered the painful and preventable injuries alleged herein.

96.     Defendants also failed to provide adequate and appropriate skin care and personal hygiene, resulting in skin breakdown to ERIK's body, failed to implement additional interventions to increase ERIK's nutritional status, failed to Provide individualized Care Plans specific to ERIK, failed to follow a Care Plan that provided interventions to prevent malnutrition, dehydration, infection, nutritional decline and overall physical decline, failed to provide staff with the knowledge, skills and competencies to care for patients with infection and skin breakdown, and failure to prevent ERIK from experiencing pain and suffering.

97.     ERIK's infections, malnutrition, dehydration, skin breakdown, went unnoticed or untreated by ARMC staff, simply because they did not have adequate staff, or adequately trained and supervised staff, and because staff was unfit to provide nursing care to dependent patients.

98.    Accordingly, decisions by the Defendants as to staffing and census were made irrespective of patient population needs within ARMC, but rather, were determined by the financial needs of ARMC.

99.    Minimum staffing of ARMC personnel was dependent by law upon the acuity (need) level of the patients of ARMC. ARMC patients acuity level during the residency of ERIK in ARMC was so high that the required "minimum" staffing ratios exceeded the applicable numeric minimum requirement of Health and Safety Code § 1276.5 pursuant to the provisions of Title 22 C.C.R. §§ 72515(b), 72329 and 42 C.F.R. § 482.30. During the residency of ERIK in ARMC, they did not meet these minimum staffing requirements based on its patients' acuity levels, including ERIK.

100.    Defendants represented to the general public and to ERIK and/or his family members, that Defendants were sufficiently staffed so as to be able to meet the needs of ERIK and that Defendants operated in compliance with all applicable rules, laws and regulations governing the operation of hospitals in the State of California. These representations were, and are, false.

101.    ARMC failed to report ERIK'S pressure sores to the Department of Public Health pursuant to Health and Safety Code § 1279.1 in a transparent and intentional effort to fraudulently cover up their malfeasance and reckless neglect of ERIK.

102.    At all times relevant hereto, ARMC owed a duty to ERIK pursuant to Title 22 C.C.R. § 70211 and promised to provide nursing service that was organized, staffed, equipped and supplied to meet the needs of ERIK. ARMC did not comply with this requirement of law in their care of ERIK thereby causing injury to ERIK.

103.    At all relevant times hereto, ARMC owed a duty to ERIK pursuant to Title 22 C.C.R. § 70213, and promised to develop, maintain, and implement written policies and procedures for patient care including assessment, nursing diagnosis, planning, intervention, and evaluation. ARMC did not comply with this requirement of law in their care of ERIK thereby causing injury to ERIK.

104.   ARMC owed a duty to ERIK pursuant to Title 22 C.C.R. § 70215(a)(1) to provide an ongoing patient assessment. ARMC did not comply with this requirement of law in their care of ERIK thereby causing injury to ERIK.

105.   ARMC owed a duty to ERIK to provide planning and delivery of ERIK'S care including assessment, diagnosis, planning, intervention, and evaluation pursuant to Title 22 C.C.R. § 70215(b). ARMC did not comply with this requirement of law in their care of ERIK thereby causing injury to ERIK.

106.   ARMC owed a duty to ERIK to provide a written, organized in service education program for its patient care personnel pursuant to Title 22 C.C.R. § 70214. ARMC did not comply with this requirement of law in their care of ERIK thereby causing injury to ERIK.

107.   ARMC owed a duty to ERIK to provide services with a sufficient budget and staffing to meet ERIK'S care needs pursuant to Title 22 C.C.R. § 70217 and 42 C.F.R. § 482.23(b). ARMC did not comply with this requirement of law in their care of ERIK thereby causing injury to ERIK.

108.   Defendants' deliberate indifference to ERIK's health and safety and to the requirements of *Health & Safety Code* sections 1276.65 and 1599.1 and Title 22, *California Code of Regulations* sections 72315(f) and 72311(a) was despicable and warrants the assessment of punitive damages.

109.   ARMC owed a duty to ERIK to protect ERIK'S right to be free from all forms of abuse pursuant to 42 C.F.R. § 482.13(c)(3). ARMC did not comply with this requirement of law in their care of ERIK thereby causing injury to ERIK.

110.   ARMC owed a duty to ERIK to provide services and activities to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each patient in accordance with a written plan of care pursuant to 22 C.C.R. § 70709. ARMC did not comply with this requirement of law in their care of ERIK thereby causing injury to ERIK.

111.   ARMC owed a duty to ERIK pursuant to 42 C.F.R. § 482.42 to provide a sanitary environment to avoid sources and transmission of infections and communicable diseases. There must be an active program for the prevention, control, and investigation of infections and communicable diseases. ARMC did not comply with this requirement of law in their care of ERIK thereby causing injury to ERIK.

112.   ARMC owed a duty to ERIK pursuant to 42 C.F.R. § 482.28(b)(2) in that nutritional needs must be met in accordance with recognized dietary practices and in accordance with orders of the practitioner or practitioners responsible for the care of the patients. ARMC did not comply with this requirement of law in their care of ERIK thereby causing injury to ERIK.

113.   While ERIK was in the care and custody of Defendants, Defendants recklessly neglected ERIK by breaching their duties of care owed to ERIK in failing to provide ERIK with the care and treatment to which he was entitled as a dependent citizen of California. These failures included, but are not limited to: failing to prevent the development of infections, failing to report his change of condition and providing timely care, failing to developing and implementing care plans, failing to provide hydration support to prevent dehydration, failing to treat the infections, failing to assist with personal hygiene resulting in skin breakdown to ERIK's body, failing to provide staff with the knowledge, skills and competencies to care for patients with infection and skin breakdown, failing to employ staff with knowledge in caring for a resident with potential swallowing difficulties and the risks that exist for potential weight loss, and failing to prevent ERIK from experiencing pain and suffering.

114.   The injuries suffered by ERIK were the result of the Defendants' illegal and reckless plan and effort to cut costs in the operation of their facilities and in other ways as alleged, to usurp the sole legal responsibility of ARMC Administrator and governing body in the planning and operation of the facilities, and thereby in the undertaking assumed all of the responsibilities of the facilities, including the duty of due care and compliance with all legal standards applicable to general acute care hospitals and skilled

nursing facilities. In doing so, the Defendants knew or should have known that their staff would be unable to comply with the standards for care set forth above, and other legal standards, all at the expense of their patients such as ERIK. Integral to this plan was the practice and pattern of staffing with an insufficient number of service personnel, many of whom were not properly trained or qualified to care for the elders and/or dependent adults, whose lives were entrusted to them. The "under staffing" and "lack of training" plan was designed as a mechanism as to reduce labor costs and predictably and foreseeably resulted in the abuse and neglect of many patients and most specifically, ERIK.

115.   At all times herein mentioned, the Defendants had actual and/or constructive knowledge of the unlawful conduct and business practices alleged herein, yet represented to the general public and ERIK. that their facilities would provide care that met all applicable legal standards. Moreover, such unlawful business practices were mandated, directed, authorized, and/or personally ratified by the officers, directors and/or managing agents of the Defendants as set forth herein, and other management personnel whose names are presently unknown to the ERIK and according to proof at time of trial.

116.   The Defendants, by and through the corporate officers, directors and managing agents set forth in herein and other corporate officers and directors presently unknown to ERIK and according to proof at time of trial, authorized and ratified the conduct of their co-defendants ARMC in that they were, or in reasonable diligence should have been, aware of the understaffing, in both number and training, the relationship between understaffing and sub-standard provision of care to the patients, including ERIK, and the Defendants practice of being issued deficiencies by the State of California's Department of Public Health in the State of California. Furthermore, the Defendants, by and through the corporate officers and directors enumerated in herein and others presently unknown to ERIK and according to proof at time of trial, ratified the conduct of themselves and their co-defendants in that they were aware that such

understaffing and deficiencies would lead to injury to the patients, including ERIK and insufficiency of financial budgets to lawfully operate their facilities.

117.   Upon information and belief, the Defendants enacted, established, and implemented the financial plan and scheme which led to their facilities being understaffed, in both number and training, by way of imposition of financial limitations on their facilities in matters such as, and without limiting the generality of the foregoing, the setting of financial budgets which clearly did not allow for sufficient resources to be provided to ERIK. These choices and decisions were, and are, at the express direction of the management personnel including the corporate officers and directors enumerated in herein and others presently unknown to ERIK and according to proof at time of trial.

118.   Plaintiffs have reason to believe that the focus and intent to carry out the above strategies to increase revenues and profit margins and to decrease costs caused widespread neglect of patients, including ERIK.

119.   Due to the Defendants' direct conduct, as well as their practice of aiding and abetting the wrongful acts and omissions alleged herein, ERIK suffered severe injuries. These injuries were not the product of isolated failures but rather the result of prolonged neglect and abuse that arose out of four calculated business practices by Defendants: (1) Understaffing; (2) relentless marketing and sales practices to increase patient census despite knowledge of ongoing care deprivation; (3) ongoing practice of utilizing unqualified and untrained employees who, by law, were forbidden by law to administer nursing care to patients; and (4) ongoing practice of recruiting heavier care patients for which the facility received higher reimbursements, despite the dangerous levels of staff who were incapable of meeting the needs of the existing resident population.

120.   The injuries suffered by ERIK and the misconduct by the Defendants, and each of them, as alleged herein, resulted from ARMC'S failure to provide basic custodial care to ERIK.

121.   Thus, the specified acts of neglect alleged herein constitute neglect of "custodial" duties, not "professional" duties. No professional license is required to ensure

that ERIK was cleaned, supervised, monitored, and provided with preventative measures, provided with proper nutrition, provided with proper hydration or otherwise not neglected. No professional license is required to ensure that Defendants' facilities not be underfunded or inadequately staffed. In sum, the acts and omissions alleged herein are acts or omissions related to "custodial" services, not "professional" services.

122. The violations of state and federal laws and regulations as specifically set forth herein as alleged against Defendants are not meant to limit the generality of the allegations contained herein, but are merely illustrative of the depth of the Defendants' malicious, oppressive, fraudulent and/or reckless conduct.

123. As a direct result of the Defendants conduct as alleged herein, Defendants allowed ERIK to suffer pain, indignity, humiliation, and injury, which were entirely preventable had Defendants provided enough sufficiently trained staff at their facilities to provide ERIK with the amount of care, monitoring, and supervision that state and federal regulations required.

124. In addition to their direct liability for the abuse and neglect of ERIK, the Defendants ratified the mistreatment of ERIK. Knowing of ERIK'S injuries, and knowing of his neglect, Defendants failed to terminate, discipline, reprimand, or otherwise repudiate the acts and omissions of any employee due to or based upon the care, treatment, monitoring or supervision, or lack thereof, rendered to ERIK.

125. ERIK suffered pain and suffering as a result of the Defendants' abuse and neglect as alleged herein. Defendants are responsible for that pain and suffering as well as all subsequent damages and expenses that were incurred in treating ERIK for the injuries he suffered at the hands of Defendants.

WHEREFORE, PLAINTIFF prays for relief against defendants, and each of them, as follows:

1.   General damages;

2.   Compensatory damages;

1        3.      Punitive damages;

2        4.      For exemplary and punitive damages pursuant to Civil Code § 3294,

3        5.      For reasonable attorney's fees, litigation expenses, and costs of suit pursuant

4   to 42 U.S.C. § 12205 and Welfare and Institutions Code § 15657(a); and

5        6.      For such other and further relief as the Court may deem just and proper.

 

                                                    SKAPIK LAW GROUP

Dated: November 3, 2022            By: _____

                                        Matthew T. Falkenstein
                                        Eric C. Morris
                                        Mark J. Skapik
                                        Attorneys for SANDRA
                                        FIGUEROA,
                                        Guardian ad litem of
                                        ERIK LOZA,

1

2

3  ### <u>DEMAND FOR JURY TRIAL</u>

4  Plaintiff hereby demands trial by jury.

5

6                                                          SKAPIK LAW GROUP

7

8  Dated: November 3, 2022                  By:

9                                                          Matthew T. Falkenstein
                                                           Eric C. Morris
10                                                         Mark J. Skapik
                                                           Attorneys for SANDRA
11                                                         FIGUEROA,
                                                           Guardian ad litem of
12                                                         ERIK LOZA,

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28